# ED MULLINAX FORD, INC., et al. v BOLTON-HOOLEY, INC., et al.

Case No. 87-1694

State of Florida, Division of Administrative Hearings

July 1, 1988

## APPEARANCES OF COUNSEL

**Steven L. Schwarzberg,** Honigman, Miller, Schwartz and Cohn, for petitioner, Ford Motor Company.

**Dean Bunch,** Rumberger, Kirk, Caldwell, Cabiniss & Burke, for petitioner.

**Jill MacDonald,** Office of the General Counsel, Dearborn, Michigan, for petitioner.

**Jerome R. Siegel,** for petitioner.

**James D. Adams,** Quinton, Lummus, Dunwody & Adams, P.A., for respondents, Bolton-Hooley, Inc., Terry Ford Company and Bill Wallace Ford, Inc.

**Michael J. Alderman,** Department of Highway Safety and Motor

Vehicles, for respondent, Department of Highway Safety and Motor Vehicles.

## OPINION OF THE COURT

JAMES E. BRADWELL, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, James E. Bradwell, held a public hearing in this case on December 14-17, 1987 in Tallahassee, Florida. Therefore, the parties were granted leave to submit proposed memoranda supportive of their respective positions. Proposed findings not incorporated herein are the subject of specific rulings in an Appendix attached hereto.

### ISSUE

Whether the application of Petitioner, Ford Motor Company and Ed Mullinax Ford, Inc., for a new motor vehicle dealer license under Section 320.642, *Florida Statutes,* should be granted on the grounds that the existing Ford dealers are not providing adequate representation in the community or territory?

### INTRODUCTION AND BACKGROUND

Applicant, Ed Mullinax Ford, Inc., filed with the State of Florida, Department of Highway Safety and Motor Vehicles, an application for the issuance of a motor vehicle dealers license pursuant to *Florida Statutes* 320.642 to operate a ford dealership in Margate, Florida. Respondents, Bolton-Hooley, Inc., Terry Ford Company and Bill Wallace Ford, Inc., objected to the issuance of this license. The Department forwarded the matter to the Division of Administrative Hearings and a hearing was held as scheduled from December 14, 1987 through December 17, 1987. At the final hearing, Ford Motor Company presented the testimony of Carlo L. Mastropaolo, Frank Veros, Michael E. Duffy, James A. Anderson, and Respondents Bolton-Hooley, Inc., Terry Ford Company and Bill Wallace Ford, Inc., presented the testimony of Dr. Lyman E. Ostlund, William L. Wallace, Michael Hooley, Peter J. Menten, Paul Clark and Leo Cumbelich by deposition.

Based on the evidence presented, the following facts are determined:

### FINDINGS OF FACT

1. Mullinax filed an application with the Department to operate a Ford dealership near the intersection of Highway 441 and Copans Road in Margate, in northwest Broward County.

2. Letters of Protest to the application were filed by the Respondents. Ford contends Wallace does not have standing to file its protest since Wallace is not located in the territory or community in which the proposed new dealership was intended to be established.

3. Ford defines the Broward County territory or community as its Ft. Lauderdale, Multiple Point ("MP") (T-I 50). Ford defines an MP as an automobile marketing area consisting of contiguous communities and is a geographic area that is too large to be served by one dealer (T-I 91). The Ft. Lauderdale MP is comprised of all of Broward County (T-I 50).

4. The Ft. Lauderdale MP is made up of six smaller markets known as primary market areas ("PMA's") (T-III 37). Each PMA consists of those census tracts most convenient to an existing dealer and identifies an area of shopping convenience for customers located in that PMA (T-I 73). Each PMA represents the area in which an existing or proposed resident dealer has or would have an advantage over other same line make dealers in the Multiple Point by virtue of the resident dealer's location (T-I 73). Presently, a Ford dealer is located in five of the six PMAs (Ford Ex. 10). The applicant is intended to be located in the sixth PMA (referred to hereafter as "PMA 899" or the "Add Point") (Ford Ex. 10).

5. Bolton is located in what may be referred to as the central-west PMA, approximately 8.5 miles south of the proposed location (Ford Ex. 26). Terry is located in the northeast PMA approximately 7.1 miles east of the proposed location (Ford Ex. 26). Powell Ford is located in the central-east PMA. Koons Ford, is located in the southwest PMA and Hollywood Ford is located in the southeast PMA (Ford Ex. 8). Wallace is located approximately 17.7 miles from the Add Point in a northern and easterly direction (Ford Ex. 26). Luke Bolton Ford, the fourth dealer, was established in 1966 (T-I 54). Koons Ford, the fifth dealer, was established in 1980 (T-I 54). The other dealers were in existence prior to that time. Each of the five existing MP dealers executed Sales and Service franchise agreements with Ford specifying Broward County as their dealer locality (i.e. the area of sales and service responsibility pursuant to the Sales and Service Agreement) (Ford Exs. 41-45). Wallace received a similar dealer locality letter listing only the communities in Palm Beach County (and which did not include any area located in Broward County) (Ford Exs. 46-47).

6. Ford's presentation at the Final Hearing was based upon its analysis of market penetration in the Ft. Lauderdale MP and in PMA 899.

7. With regard to market definition, the Respondents offered no specific alternative market definition but contended only that they competed with other Ford dealers in the "South Florida area" which they described generally as consisting of Palm Beach, Broward, and Dade Counties. Respondents did not attempt to provide any analysis of market penetration or other relevant statistics for that area.

8. Ford presented evidence of cross-sell data, which identifies the addresses of purchasers from sales (inside and outside the MP) by each of the MP dealers and Wallace, respectively. In 1986 the cross-sell data showed that only 5.5 present of all of the vehicle sales located within the Ft. Lauderdale MP were generated from all of the Ford dealers located in the West Palm Beach MP (Ford Ex. 3). Only 4.4 percent of the retail care sales and 5.3 percent of the retail light truck sales in 1986 in the Ft. Lauderdale MP came from Wallace (Ford Ex. 7). Additionally, in 1986, no more than 14.9 percent of Wallace's retail care and 20.7 percent of his retail light truck sales were to persons living in the Ft. Lauderdale Multiple Point (Ford Ex. 8).

9. By contrast, approximately 79 percent of the cars and 78 percent of the truck sales to addresses within the Ft. Lauderdale MP were from sales generated by the existing Ford dealers located within the Ft. Lauderdale MP (Ford Ex. 3). Only 21.6 percent of sales found in the MP were generated by existing Ford dealers located in the Miami and West Palm Beach MP's and all other areas outside of the Ft. Lauderdale MP (Ford Ex. 3).

10. Ford presented an analysis of cross-sell data for the years 1984-1986 relative to four U.S. Post Office area located in the northern portion of the Ft. Lauderdale MP (Coral Springs, Deerfield Beach, Lighthouse Point and Margate) (Ford Exs. 4-6). Those statistics, taken as a whole, reflect that during the past three years, more than 80 percent of the car and truck retail sales into the four northern U.S. Post Office areas of the Ft. Lauderdale MP have been generated by the MP dealers themselves. The balance came from the dealers in the Miami and West Palm Beach MP's and all other areas outside of the Ft. Lauderdale MP (Ford Exs. 4-6).

11. Based upon all of the evidence presented by both sides, I find that the territory or community, as is referred to in Section 320.642, *Florida Statutes,* relevant to the inquiry in this case, consists of Ford's Ft. Lauderdale MP.

12. The population of the MP, and in PMA 899 in particular, has increased significantly over the last two decades. In 1970, the population in the MP was 620.051. By 1980, it increased to 1,018,010 and to

**195**

an estimated 1,159,300 by 1987 (87% increased over 1970) (Ford Ex. 11). The population in PMA 899 went from 28,467 in 1970 to 147,011 in 1980 and to 207,800 in 1987 (630% increase over 1970) (Ford Ex. 11).

13. The number of households, one of the most reliable indicators of buying units, also increased dramatically. In the MP, the number of households in 1970 was 221,825, in 1980 it was 417,517 and in 1987 it was an estimated 499,500 (1255 increase over 1970) (Ford Ex. 13). In the Add Point PMA, the number of households in 1970 was 8,509, in 1980 it was 56,200 and in 1987 there was an estimated 83,900 (886% increase over 1970) (Ford Ex. 13).

14. The population growth has occurred in each of the PMAs, but in PMA 899, in particular. Approximately 43 percent of the population growth in the entire Ft. Lauderdale MP can be attributed to growth in PMA 899 from 1980 to 1987 (T-I 75-6). Approximately 34 percent of the additional households in the Ft. Lauderdale MP from 1980 to 1987 came from the increase in the number of households in PMA 899 (Ford Exs. 11 and 13).

15. Most of the census tracts located in Broward County experienced an increase in households from 1970-1987 with the highest concentration of increases located in the area comprising PMA 899 (Ford Exs. 49*40 and 49*41).[1]

16. In 1960, the number of households per-Ford-dealer in the Ft. Lauderdale MP was 36,201. That number increased in 1980 to 104,379. That year, when Koons Ford was established, the number of households per Ford dealer dropped to 83,503. In 1987, it was 99,876 per dealer. If the Add Point had been established in 1987, the number of households per Ford dealer would have decreased to 83,230, which is the level that previously existed in 1980 and which is more than twice the ratio which existed in 1960. (Ford Ex. 49*46).

17. The average number of car registrations per Ford dealer for all of the multiple points in the Jacksonville District in 1986 was 9,076. The number of car registrations per Ford dealer in the Ft. Lauderdale MP without an open point was 11,996. If an Add Point had been established in PMA 899, the number of car registrations per Ford dealer would have dropped to 9,997 in 1986, still appreciably higher than the average number for all of the MP's in the Jacksonville District (Ford Ex. 49*47).

---

[1] * denotes James Anderson's Composite Exhibit 49 and the corresponding page number.

18. The annual average daily traffic counts at three locations surrounding and near the proposed Add Point increased approximately 125 from 1985 to 1987 (Ford Ex. 25).

19. From 1982-June, 1987, the number of residential building permits issued in four municipalities located totally within PMA 899 (Coconut Creek, Coral Springs, Margate, and Parkland) accounted for a low of 19.4 to a high of 29.6 percent of all the building permits issued in all of Broward County (Ford Ex. 14). Although certain areas are also located within PMA 899 but are in municipalities which are not totally located within PMA 899, building permits issued for those areas were not included. Therefore, the percentage of the building permits issued in PMA 899 compared to the total permits issued in Broward County was actually higher (Ford Ex. 14) (T-I 78-9).

20. From August, 1983 to October, 1987, fourteen car franchises were established in the Ft. Lauderdale MP (For Ex. 23). Nissan, Oldsmobile, and Honda established Add Points in Coral Springs, within a few miles of where Ford intends to establish its new dealership (Ford Ex. 27).

21. The total industry retail car registrations in the MP from 1980 to June, 1987, year-to-date annualized, increased from 48,989 to 60,160 (235) (Ford Ex. 19). Retail light trucks increased from 7,742 to 18,316 (137%) during the same period (Ford Ex. 20). Total industry retail car registrations in PMA 899 increased from 6,687 to 11,966, (79%) (Ford Ex. 21) and for trucks from 980 to 3,284 (235%) during the same period (Ford Ex. 22). There were approximately 22,000 additional retail car and truck registrations in the MP from 1980 to June, 1987, year-to-date annualized, an increase of over 38 percent (Ford Exs. 19, 20). The percentage of registrations for retail car and truck in PMA 899 increased approximately 99 percent during the same period (Ford Exs. 21, 22).

22. Approximately 35 percent of the total increase in registrations for retail cars and light trucks in the Ft. Lauderdale MP occurred in PMA 899 itself (Ford Exs. 19-22).

23. The data, taken as a whole, clearly establishes that the Ft. Lauderdale MP and PMA 899 have been in a considerable and steady growth mode for an extended period of time. Large clusters of population, households, and registrations are located near the centers of each of the six PMAs, and in the Add Point PMA in particular (T-I 79, 84, 96, 99) (T-III 79, 80) (T-VIII 211) (Ford Exs. 49*38; 49*39; 49*49, 50).

197

## Market Penetration

### Introduction

24. Ford conducts periodic analyses of market penetration in the MP by reviewing registration data provided by R. L. Polk & Company ("Polk") at census tract levels (T-I 74; T-III 36). The Polk registration data includes every vehicle (cars and trucks) registered to an address within a particular area of geography (census tract) regardless of the identity of the selling dealer.[2]

25. Market penetration data was introduced by both parties covering the period 1980 to June, 1987 year to date.

26. Polk registration data is made up of components including "retail," "fleet," and "dealer/manufacturer," which taken together constitute "total" registrations. Fleet registrations are registrations to a buyer who registered ten or more vehicles, of any make, during the course of one year.

27. Adequacy of representation is primarily determined by using retail registration data (T-III 32, 68-9). Use of retail penetration data is an appropriate measure in determining adequacy of representation (T-III 45-6, 48). Respondent's expert, Dr. Ostlund, acknowledged that evaluation of retail penetration is more important than total to analyze dealer network planning (T-VIII 173).

28. Retail market penetration is a relative concept that compares the retail registrations of one line make vehicle (car or truck) with the total retail industry registrations of that type vehicle (car or truck) in a particular geographic area (T-III 31-2). An individual dealer's sales record's standing alone, are not helpful when evaluating market penetration.

29. "Retail registration efficiency to district, average and national average" is the percentage relationship between retail penetration in a smaller geographical area (MP or PMA) and district penetration or national penetration (as the case may be) (T-III 31).

### Ft. Lauderdale MP

30. Ford's retail car registration penetration in the Ft. Lauderdale MP as of June, 1987, year-to-date, was 8.8 percent, as compared with

---

[2] The parties stipulated to the admissibility of Polk data and that Polk accurately processes the data it receives pursuant to its formulas and methods of calculation. No objections were raised at the Final Hearing to the introduction of exhibits based on Polk data. Both parties relied upon the Polk data in the presentation of their testimony and exhibits.

11.6 percent for the Jacksonville District and 13.3 percent for the nation. The MP had an efficiency of 76 percent of the Jacksonville District and 66 percent of the nation. The low levels of efficiency were relatively constant from the period 1980-1987 (Ford Ex. 28).

31. The total car registration penetration (including both retail and fleet) in the Ft. Lauderdale MP as of June, 1987, year-to-date, was 10.1 percent, as compared with 12.0 percent for the entire Jacksonville District and 14.4 percent for the nation. The efficiency of the Ft. Lauderdale MP was 84 percent of district and 70 percent of the nation for total car registrations. (For Ex. 29).

32. Ford's retail truck registration penetration in the Ft. Lauderdale MP as of June, 1987, year-to-date, was 24.4 percent, as compared with 29.1 percent for the Jacksonville District, as well as for the nation. The MP had an efficiency of 84 percent of the District and the nation (Ford Ex. 30).

33. The total truck registration penetration (including both retail and fleet) in the Ft. Lauderdale MP as of June, 1987, year-to-date, was 23.7 percent, as compared with 28.5 percent for the entire Jacksonville District and 29.3 for the nation. The efficiency of the Ft. Lauderdale MP was 83 percent of the District and 81 percent of the nation for total truck registrations. (Ford Ex. 31).

34. The car and truck retail penetration and registration efficiency statistics for the MP for 1980 -June, 1987, inclusive, are summarized as follows:

## MARKET SHARE ANALYSIS

## FT. LAUDERDALE MP

## FORD % INDUSTRY—RETAIL

|  | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | June 1987 |
|---|---|---|---|---|---|---|---|---|
| Ft. Lauderdale M.P. | 8.5 | 8.6 | 8.2 | 7.7 | 7.8 | 7.7 | 7.8 | 8.8 |
| Jax District | 11.7 | 10.4 | 10.3 | 9.8 | 11.1 | 11.3 | 10.7 | 11.6 |
| Nation | 11.9 | 10.9 | 10.5 | 10.3 | 11.3 | 11.8 | 11.6 | 13.3 |
| M.P. % District | 73 | 83 | 80 | 79 | 70 | 68 | 73 | 76 |
| M.P. % Nation | 71 | 79 | 78 | 75 | 69 | 65 | 67 | 66 |

(Ford Ex. 28)

## MARKET SHARE ANALYSIS

## FT. LAUDERDALE MP

### FORD % INDUSTRY—RETAIL

|  | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | June 1987 |
|---|---|---|---|---|---|---|---|---|
| Ft. Lauderdale M.P. | 29.1 | 34.1 | 32.5 | 31.6 | 24.4 | 23.8 | 22.6 | 24.4 |
| Jax District | 34.7 | 35.8 | 32.5 | 34.0 | 29.5 | 27.4 | 27.8 | 29.1 |
| Nation | 31.0 | 30.7 | 28.7 | 30.7 | 27.6 | 25.6 | 27.5 | 29.1 |
| M.P. % District | 84 | 95 | 100 | 93 | 83 | 87 | 81 | 84 |
| M.P. % Nation | 94 | 111 | 113 | 103 | 88 | 93 | 82 | 84 |

(Ford Ex. 30)

35. The Ft. Lauderdale MP ranked ninth (i.e. last) out of all of the MP's in the Jacksonville District for retail car registration efficiency for 1985 and 1986, and eighth in 1987 (Ford Exs. 49*9-13). For retail trucks, in 1985, the MP ranked sixth, in 1986 it ranked eighth, and in 1987 it ranked ninth (out of nine) (Ford Exs. 49*14 to 49*16). In 1986, the retail registration efficiency for cars of the Ft. Lauderdale MP was 73 percent of District and 67 percent of national, as compared with the Tampa MP which was 113 percent of District and 105 percent of national (Ford Ex. 49*2). In 1986, for trucks, the Ft. Lauderdale MP efficiency rates were 81 percent of District and 112 percent of national (For Ex. 49*3). In 1986, the Ft. Lauderdale MP's retail car penetration rate was 7.8 percent compared with 12.2 percent for the Tampa MP (Ford Ex. 49*4). For trucks, the Ft. Lauderdale retail penetration rate in 1986 was 22.6 percent as compared with 31.2 percent for the Tampa MP (Ford Ex. 49*5).

### PMA 899

36. Ford's car registration penetration in PMA 899 as of June, 1987, year-to-date, was merely 7.8 percent, as compared with 11.6 percent for the Jacksonville District and 13.3 percent for the nation. The PMA had an efficiency of 67 percent of the Jacksonville District and 59 percent of the nation. The low levels of efficiency were relatively constant for the period 1980-1987 (Ford Ex. 15).

37. Ford's retail light truck registration penetration in PMA 899 as of June, 1987, year-to-date, was merely 21.1 percent, as compared with 39.2 percent for the Jacksonville District, and 29.4 percent for the nation. The PMA had an efficiency of 72 percent of the District and the nation. (Ford Ex. 17).

38. The car and truck retail penetration and registration efficiency statistics for PMA 899 from 1980 -June, 1987, year-to-date, are summarized as follows:

**200**

## MARKET SHARE ANALYSIS
### PMA 899
### FORD % INDUSTRY—RETAIL

| Add Point PMA | 8.2 | 7.2 | 7.5 | 6.2 | 6.5 | 6.2 | 6.4 | 7.8 |
|---|---|---|---|---|---|---|---|---|
| Jax District | 11.7 | 10.4 | 10.3 | 9.8 | 11.1 | 11.3 | 10.7 | 11.6 |
| Nation | 11.9 | 10.9 | 10.6 | 10.3 | 11.3 | 11.8 | 11.6 | 13.3 |
| Add Point PMA % District | 70.1 | 69.2 | 72.8 | 63.3 | 58.6 | 54.9 | 59.8 | 67.2 |
| Add Point PMA & Nation | 68.9 | 66.1 | 71.4 | 60.2 | 57.5 | 52.5 | 55.2 | 58.6 |

(Ford Ex. 30)

## MARKET SHARE ANALYSIS
### PMA 899
### FORD % INDUSTRY—RETAIL LIGHT TRUCK

| N.W. Broward Add Point | 25.2 | 28.3 | 31.1 | 29.3 | 22.7 | 21.1 | 21.3 | 21.1 |
|---|---|---|---|---|---|---|---|---|
| Jax District | 34.9 | 36.1 | 32.6 | 34.2 | 29.5 | 27.4 | 28.0 | 29.2 |
| Nation | 31.5 | 31.3 | 29.0 | 31.1 | 27.8 | 25.8 | 27.7 | 29.4 |
| Add Point PMA % District | 72.2 | 78.4 | 95.4 | 85.7 | 76.9 | 77.0 | 76.1 | 72.3 |
| Add Point PMA & Nation | 80.0 | 90.4 | 107.2 | 94.2 | 81.7 | 81.8 | 75.9 | 71.8 |

(Ford Ex. 30)

39. PMA 899 ranked sixth (i.e. last) out of all of the PMA's in the Ft. Lauderdale MP for retail car penetration for the years 1985-1987, June year-to-date (Ford 49*9 through 49*13). With regard to retail light trucks, PMA 899 ranked sixth in 1985 and in 1986 and 1987, June, year-to-date, it ranked fifth (Ford Exs. 49*14 through 49*16).

### Appropriateness of the Standard

40. It is appropriate to compare the penetration and efficiency rates of the Ft. Lauderdale MP to the Jacksonville District and the nation as a whole (T-III 43-4, 64). The profile of the Ft. Lauderdale MP is not distinct when compared to the nation or the district so as to preclude a comparison of the penetration and efficiency rates in order to evaluate the adequacy of representation of Ford by the existing dealers (Ford Exs 49*3 to 49*32) (T-III 43-4, 64).

41. Extensive examination was conducted in the review of data before arriving at the conclusion that it is appropriate to compare the performance of a particular community or territory to that of a larger geographical area (in this case, the Jacksonville District and/or the

nation), for the purpose of determining adequacy of representation (T-III 43-44).

42. The examination of the market under review centers on age, income, and product popularity characteristics of the market, as compared with the nation. It is also appropriate to determine whether areas exist within (T-III 94, 98, 107), (Ford Exs. 49*53, 56, 70, 71) and adjacent to (Ford Ex. 49-2) the market which are attaining District or national average penetration. On the subject of age, the only difference between the MP and the nation appears in the "55-and-over" category, where the MP has a somewhat higher representation than the nation (Ford Ex. 49*23) (T-III 55-6). With regard to household income, the distribution of income in the MP is comparable to that of the nation with a very slight deviation in the $20,000-$55,000 category where the MP has a lower representation than the national (Ford Ex. 49*25) (T-III 58). The MP has a relatively higher percentage of households in the "over $55,000" category as compared with the nation (Ford Ex. 49*25). With respect to industry product popularity, by size class, there are some variations among the seven classifications of cars (Ford Ex. 49*27) and the seven classifications of trucks (Ford Ex. 49*30), to varying degrees.

43. Ford's expert, James Anderson, performed a statistical analysis comparing a weighted average for car and truck penetration expected in the Ft. Lauderdale MP based upon age, income, and product popularity, respectively, as compared with the national averages for each. The penetration rates for the Ft. Lauderdale MP as a percent of the nation were between 94 and 99 percent (Ford Exs. 49*24, 26, 18, 29, 31, 32). Therefore, it is concluded that any deviations in age, household income, or product popularity characteristics of the Ft. Lauderdale MP market do not account for the low penetration and efficiency rates of the Ft. Lauderdale MP, as compared with the nation (Ford Exs. 49*23 trough and including 49*32) (T-III 56-62).

44. James Anderson also calculated Ford retail car penetration efficiency compared to the national average for certain indicated groups for 1986 and 1987, June, year-to-date (Ford Ex. 49*33 and 49*34). The Ford registration efficiencies of the MP compared with the nation were similarly low even when non-captive imports, luxury, and Mercury categories were removed from the analysis (For Ex. 49*33) (T-III 66). Likewise, any influence on Ford's efficiency rating caused by leasing activity was minimal as well; the efficiency of the Ft. Lauderdale MP compared with the national average for "total" (which includes leases) was only 75% (Ford Ex. 33) (T-III 67).

202

45. Overall, any suggestion that the low penetration and efficiencies in the Ft. Lauderdale MP could be explained away due to deviations in product popularity or a disproportionate predisposition of persons in the Ft. Lauderdale MP to prefer non-captive imports, luxury, cars, or Mercury cars (or that the Ft. Lauderdale MP has a disproportionately high degree of fleet business as compared to the rest of the nation) is not supported by the evidence.

46. Ford has demonstrated that there are areas within the Ft. Lauderdale MP which are achieving or exceeding national average retail penetration (Ford Exs. 49*53, 54 and 49*70, 71). Additionally, a number of the other MP's in the Jacksonville District, for example, the relatively comparable markets of Tampa and Pensacola, have had penetration rates which have exceeded national average penetration over the period 1985-1987 for both cars and trucks (Ford Ex. 49*2) (T-III 33).

47. Taken together, the analysis of these factors result in the conclusion found herein that national average retail penetration is a reasonable and achievable norm against which to evaluate the Ft. Lauderdale MP and the PMA's within it. Further, the performance of the MP may also be measured against the District average, which is at or below national average for 1986 and 1987 and, therefore, is a more conservative standard (T-III 64).

48. A "net registration loss" is the difference between the actual Ford retail registrations in an area and the number of registrations that would have occurred had a given norm (e.g., district or national average penetration) been achieved (T-III 38). Substantial net registration losses, measured against district and national norms, have existed and still exist to a great extent in the Ft. Lauderdale MP as a whole and in PMA 899 in particular (Ford Exs. 49*9 through 49*16, and 49*19 through 49*22) (T-III 50). It was projected that Ford will suffer net registration losses in the MP amounting to 2,778 vehicles in 1987 (1,706 cars and 1,072 trucks), when compared against the District average (Ford Ex. 49*20). The net registration losses would be as high as 3,874 vehicles (2,762 cars and 1,112 trucks) when measured against the national average penetration rates (Ford Ex. 49*22). In the Add Point PMA 899 itself, for 1987, Ford can expect to suffer net registration losses of 714 vehicles (450 cars and 264 trucks) when measured against the District average penetration rates (Ford Ex. 49*19). The net registration losses increased to 930 vehicles (660 cars and 270) trucks) when the penetration rate for PMA 899 is compared with the national average penetration rates (For Exs. 49*19 through 49*22, inclusive). Ford's net registration losses in the MP and in the PMA

**203**

899 in particular have been substantial at least during the entire period from 1985 -June, 1987 (Ford Exs. 49*9 through 49*16, inclusive).

## Customer Convenience and Dealer Proximity

49. Ford's penetration declines significantly as the distance from an existing dealership increases (Ford Ex. 49*90). There is a direct correlation between proximity to a dealer and a manufacturer's penetration rates (Ford Exs. 49*89, 90, 92, 93). Although cars and trucks are registered through the MP, the registrations are clustered around existing Ford dealerships (Ford Exs. 49*49 through 49*52 and 49*66 through 49*69). The rates by which individual Ford dealerships penetrate the market decrease as the distance from that dealership increases (Ford Exs. 49*56, 58, 60, 62, 64 and 49*73, 75, 77, 79, 81). Penetration rates within two-mile concentric rings around each of the Ford dealerships declines as the distance away from the dealership increases. The penetration distribution by distance as an average for all dealers for retail car registration averages 4.0 percent within the ring which is two miles from the dealership; it is 2.0 percent within the ring, six miles from the dealership, .07 percent 12 miles from the dealership, and .02 percent twenty miles from the dealership (Ford Ex. 49*65). A similar pattern was established in reviewing penetration statistics for trucks (Ford Ex. 49*82). The penetration distribution by distance from one of the existing Ford dealers (Powell Ford) for all registrations, regardless of the identity of the selling dealer, also declines dramatically as the distance from the dealership increases from two miles to ten miles (9.7 percent penetration compared to 7.2 percent) (For Ex. 49*90). Similarly, as the distance from the proposed Add Point is increased from two miles to ten miles, the retail car penetration rates increase from 6.2 percent to 8.0 percent, respectively (Ford Ex. 49*89). The more proximate a dealer is to the buying public, the more likely it is for that dealer to be able to penetrate the market closest to that dealer (T-III 114, 122).

50. The Coral Oldsmobile dealership was established in 1985 as an add point in Coral Springs (in the area described as Ford's Add Point PMA 899). The Oldsmobile retail penetration efficiency in PMA 899 compared to the MP average increased from a low of 93% in 1983 to 114% in 1985, 125% in 1986 and 122% in 1987 (June, year-to-date) (Ford Ex. 49*91). The penetration distribution by distance from the area where Coral Oldsmobile is located, for the period before that dealership was established, was relatively level regardless of the distance from that location (Ford Ex. 49*92). In 1986, after Coral Oldsmobile was established, the positive effect of greater dealer proxim-

204

ity was evident; the penetration for Oldsmobile within two miles of that dealership rose to 8.5% and declined to 6.3% as the distance increased to 10 miles from that dealership. (Ford Ex. 49*92, 93) (T-III 128-9).

51. Taken together, it is concluded that average penetration for all dealers in the Ft. Lauderdale MP is reduced significantly as the distance from the dealership increases (T-III 113, 114).

52. In PMA 899, the average distance to the nearest Ford dealer presently (without the Add Point) is 7.1 miles (Ford Ex. 49*84). If the Add Point were established, the average distance would be reduced dramatically to 3.3 miles. With a new dealer established, Ford's ranking among other manufacturers in average distance would go from ten to second among thirteen manufacturers in terms of average distance (Ford Ex. 49*84).

53. In 1986, the Ft. Lauderdale MP experienced 931 insells (or pump-ins) of Ford retail cars (Ford Ex. 54-14) and 997 insells of retail light trucks (Ford Ex. 71-A). This high level of insells into the Ft. Lauderdale MP likely reflect a relatively high level of dissatisfaction among consumers with the Ford dealers in the MP (T-III 97) which may be an indication of deficient dealer performance and/or inadequate representation (T-VIII 187).

54. In summary, the behavior of Broward County residents evidences that they are more predisposed to buy Fords if a Ford dealership is proximately located to them and, further, a significant percentage of Ford buyers are willing to travel outside of the MP to purchase Fords due to the high level of dissatisfaction with the existing Ford dealers. When consideration is given to the fact that there is no dealer representation present in PMA 899 (where a significant percentage of the population of Broward County is located), it is clear that dealer proximity and customer convenience support the conclusion that the existing dealers are not providing adequate representation of Ford and that the establishment of a new dealership in PMA 899 is warranted.

### Respondent's Representation Contentions

#### Imports

55. Respondent's explanation of Ford's low penetration centers around the theme that Broward County is unique, especially in the area of import penetration, and therefore cannot appropriately be compared with the nation as a whole or with other markets (T-VIII 38).

56. Respondents offered evidence to show that cars produced by European and Asian "import" manufacturers (not necessarily cars

**205**

produced overseas) attain a larger retail market share in Broward County than in the nation as a whole. (Res. Ex. 1). However, Respondents did not prove that those "import" vehicles were not appropriate to consider as a part of the total industry in determining the adequacy of Ford's representation.

57. Respondent's expert based his contentions in this regard on the allegation(s) that (1) repurchase by previous Ford Buyers is an important source of Ford sales; and (2) there is relatively little crossover of import buyers back to domestic makes (T-VIII 19-20). However, competent and substantial evidence was presented to prove those allegations.

58. Ford's evidence demonstrated that two other Florida markets, Miami and Orlando, had higher import penetration than Ft. Lauderdale while maintaining a higher penetration for Ford as well. (Ford Ex. 24). Similarly, from 1986 to 1987, in six of the nine MP's in the Jacksonville District, both Ford and import retail car penetration increased simultaneously. (Ford Ex. 24).

59. Respondents offered no standard against which they contend the adequacy of Ford's representation should be judged in Ft. Lauderdale, even taking into account their contentions concerning the impact of imports. However, measuring Ford's retail car penetration only against "domestic" makes indicates that even against this standard, Ford achieved only 76% of its national penetration in the Ft. Lauderdale MP (Ford Ex. 49*33).

60. Compared to the nation as a whole, Ford has a much smaller percentage of its dealer network in Ft. Lauderdale than do the imports (Ford Ex. 49*48). The imports have added 12 new dealerships between August 1983 and October 1987 while the domestic manufacturers have added only two. (Ford Ex. 23).

61. Respondent Wallace, who own adjacent Ford and import dealerships, testified that this proximity of dealerships improves his ability to close Ford sales because of cross-shopping between the dealerships (T-VI 162).

### Characteristics of the Market

62. The age, income, and automotive size-class buying preferences of the MP causes the market not to be receptive to Fords, Respondents contended. Respondents did not, however, analyze these factors or estimate the market share which Ford should be expected to attain. Ford proved that, taking these factors into account, national average continued to be a realistic expectation for Ford, given the significant

**206**

deviation between Broward and the U.S. in the three areas of examination. (Ford Exs. 49*24 [age], 49*26 [income], and 49*28-32 [size-class popularity].

63. Respondents also testified that various ethnic and racial groups in the MP are not disposed to buy Fords. (T-V 38-44, 63, 130). They offered only their personal perceptions and impressions on this issue, however, and no competent substantial evidence on which it is possible to base any findings of fact.

64. Respondents also contended, without any quantitative evidence, that their sales efforts were understated to the extent that temporary residents who purchase cars in Ft. Lauderdale register them at their permanent northern addresses. Ford demonstrated, however, that only 1.1% of sales of the Broward dealers listed addresses outside the Jacksonville District (Ford Ex. 49*35). The impact of that small a number on the MP penetration rates would be diminished (T-VIII 326-7).

## Sale of Used Rental Cars

65. Respondents contended that registration of new Fords in Broward County is adversely impacted by the resale of cars originally used as rental units.[3]

66. Respondent's expert's definition of a rental resale which is competitive with a new car is a rental car sold within the current automotive model years (T-VIII 319) (this definition is also consistent with the testimony of Mr. Wallace that new rental units are bought to be rented during December, January, and February, and are thereafter sold (T-V 92). Respondents presented no specific quantiative evidence concerning the mileage, age, or other characteristics of any of the rental vehicles when they were resold. Respondents presented no evidence to establish that used rental vehicles were in any sense equivalent to new vehicles. Therefore, even if such contentions were relevant, it is not possible to determine whether, as Respondents' contend, the rental units are equivalent to new units when resold.

67. Registration data is based upon the address of the person registering the vehicle, and not the location where the sale takes place or the tax collector's office where the transaction is entered (T-VIII 353). The fact that rental cars are for sale or are sold at locations in

---

[3] Ford objected to the evidence offered by Respondents concerning the rental resales on several grounds. This evidence was considered relevant and was received over objection.

207

the area is not probative of the impact which such sales have upon the county's registrations.

68. Respondents also offered no evidence concerning the impact on Ford registrations, as opposed to impact upon the industry in general. Based upon Respondent's evidence, it is not possible to determine whether, if any impact exists, it is directed at Ford.

Using Respondents' definition of current model year rental car resales for 1986, however, Ford analyzed re-registrations of these vehicles. First, it was determined that only 120 Fords, or 1.53% of the total number examined, were re-registered to Broward addressed during the period. (Ford Ex. 58). Further, even if there were no other resales from the remainder of the industry, Ford's retail penetration for 1986 would only increased from 7.8% to 8.0%, still far below any penetration standard offered (Ford Ex. 58). A similar situation exists regarding trucks (Ford Ex. 59).

70. Respondents attempted to demonstrate that the leasing of vehicles, as a substitute means of financing, cast doubt upon the inadequacy of Ford representation as demonstrated through the retail penetration data. Nevertheless, Wallace admitted that a retail sales transaction is different from what Wallace referred to as a "retail" lease transaction (T-VI 184). Wallace distinguished the features of a lease transaction by pointing out that when a lease term had expired, the lessee was required to return the vehicle to the lessor; the amount required to be paid at the beginning of a lease term was different from a down payment required in a retail sales transaction; and a lease transaction had different tax consequences than purchasing a vehicle would. (T-VI 184).

71. Respondent's data on this issue is contained in Respondent's Exhibits 14-18. Although the titles on the exhibits sometimes refer to fleet (Res. Ex. 14) and sometimes to lease (Res. Ex. 18), the vehicles included in these categories include both vehicles which are involved in retail leases to individuals and sales to daily rental companies (T-VIII P. 48, Line 17). Thus, none of the data is isolated upon retail leases.

72. Further, there is no evidence to demonstrate that, even taking rental car sales and retail leases together, that the retail leasing of Fords has a greater impact on Ford's representation compared to the industry. For example, Ford's fleet registrations in Ft. Lauderdale are approximately 56% of the total registrations compared to 65% for Chevrolet and 57% for Toyota. (Res. Ex. 18).

73. Wallace's attempt to show that the impact of leasing on Ford is different than the rest of the industry was unpersuasive and internally

208

inconsistent. While Wallace testified that Ford does not have leasing resources as available as the rest of the industry (T-V 127), Menten testified that Ford had the advantage until the end of 1986, when the rest of the industry surpassed Ford (T-V 45). Also, it was admitted that Ford's low Annual Percentage Rate financing programs reduced the frequency of leasing transactions as, what Respondents contend to be, an alternative method of financing (T-V 37). During all these alleged changes in leasing forces, Ford's penetration has remained stable and low.

74. Although both experts agreed that retail penetration was a more important factor in judging adequacy of representation (T-III 32, 68-9; T-VIII 173), Ford's market share of total registrations, which include fleet sales to car companies and, what Respondents refer to as "retail" leases, is similarly substantially below District and national standards. (Ford Exs. 49*33, 29, 31) and (T-III 67). Both experts relied on the R. L. Polk data upon which both the retail and total penetration is based.

## Allocation

75. Respondents contend that the MP dealers are victims of inadequate supply which adversely impacts their ability to penetrate the market. They offered no quantitative evidence other than their own perceptions and impressions to support this contention. Indeed, they admitted that the MP dealers were not discriminated against in the allocation system as compared to other Ford dealers in the District (T-V 12, 46, 170 and T-VI 170-3, 243).

76. Ford's allocation system is designed to equitable distribute products to the dealers (T-II 164) and to equalize the day's supply of vehicles in each dealership. (T-II 164). The system uses the inventory and sales history of each dealer for each car line to allocate each week's production (T-II 171-2). Each dealer is encouraged to have sufficient orders, specifying the options, color, etc. of each vehicle, in the system prior to each week's allocation so that each vehicle allocated can be built against these orders (T-II 177). Ford's representatives work with dealers to assist in placing these orders (T-II 245). To the extent a dealer fails to have orders to meet his allocation, the dealer is said to have "passed" on allocation (T-II 240). Vehicles which cannot be allocated to a dealer for lack of orders are offered to other dealers in the District who had placed orders to fill all of their allocation. (T-II 182).

77. Each dealer influences his allocation through his rate of sales and size of inventory, with those dealers having the fastest sales and lowest inventory gaining the highest allocation (T-II 172-177; T-V 33, 34).

**209**

The various Respondents who testified acknowledged that each has different marketing philosophies which affect their sales rate and inventory, and therefore their allocation (infra) (T-V 71, 75).

78. For example, Hooley indicated he attempts to keep a low inventory to reduce his expense (even though he recognizes that he has a better chance to sell if he maintains a higher inventory). (T-V 24). Hooley spends approximately $50,000 per year in advertising (T-II 248, T-V 17, and T-VI 234), as compared with the $1.2 million dollars Wallace spends on advertising (T-II 248, T-V 72). Menten engaged in the practice of transferring large quantities of vehicles already in inventory to other dealerships (T-V 32). For example, on March 31, 1986, Terry transferred 54 vehicles, mostly to a dealer in Tampa. (T-II 243-244). All of the Respondents passed on a considerable number of vehicles during the past four model years: Luke Bolton Ford, 4,211 vehicles; Terry Ford, 1,931 vehicles; and Bill Wallace Ford, 1,350 vehicles (Ford Exs. 32-37) (T-II 243).

79. The Respondents admitted that over the past few years, there were periods where various of the Ford line makes were in good supply. (T-V 20). Further, Hooley was aware that at various times during the past few years, the Jacksonville District received additional product from Ford. (T-V 26). One Respondent even admitted filing nonexistent and false fleet orders to corrupt the system. (T-V 181).

80. In the past few years, Ford has engaged in limited marketing programs designed to meet other manufacturers' competitive efforts in district regions of the country by offering certain pricing incentives to Ford dealers on some size-classes. One such program was the "Green-belt Program," which, for a limited time, enabled Ford purchasers located in the northeast region to offer customers reduced prices on commodity packages. The purpose of the program was designed to make the Ford Escort compete more favorable with the Omni/Horizon during a period in which Chrysler offered discounts on optional equipment packages. Consequently, Ford sales increased, and the Ford allocation system responded by increasing the earned allocation of dealers in that region. During most of the period of time the program was in effect (during the last quarter of 1984 and the first three quarters of 1985), the day's supply of Escorts in the Jacksonville District was far in excess of the day's supply of Escorts for the rest of the nation. Once the program proved to be a success, it was instituted nationally. The net number of Escorts which were ultimately sold to Ford customers located in the northeast region was so minimal so as not to adversely impact the ability of dealers in the Ft. Lauderdale MP to penetrate their market. (T-II 189).

210

81. In summary, Respondents did not prove, or even allege, any discrimination or unfairness which would point to allocation as the cause of the inadequacy of representation in the MP. This finding is supported by the consistent inadequate representation over times both of relative scarcity and abundance of vehicles.

## Conclusion

82. Taken together, none of the Respondents' representation contentions were supported by the evidence and were otherwise disproven by Ford. Even had the Respondents been able to establish their contentions, they offered no evidence quantifying the impact the factors they raised might have had on the penetration and efficiency performance of MP dealers.

83. The totality of the evidence demonstrated not that the Ft. Lauderdale MP was unique but that the existing Ford dealers located there were providing inadequate representation of Ford. (T-I 101; T-III 75). The contention of the Respondents that the market could not or would not support the establishment of another Ford dealership was rebutted by evidence offered by Ford which sows that the existing Ford dealers were not providing adequate representation of Ford in the territory or community.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearing has jurisdiction of the subject matter and the parties thereto pursuant to Section 120.57(1), *Florida Statutes.*

2. Section 320.642, *Florida Statutes,* establishes the following standards for acting on an application for a motor vehicle dealer license:

The Department shall deny an application for a motor vehicle dealer license in any community or territory where the licensee's presently licensed motor vehicle dealer or dealers have complied with licensee's agreements and are providing adequate representation in the community or territory for such licensee. The burden of proof in showing inadequate representation shall be on the licensee.

3. Since no issue has been raised concerning whether Ford's present dealers in the Ft. Lauderdale MP have complied with their franchise agreements, the sole issue is whether such dealers are providing "inadequate representation" of Ford in the "community or territory" involved.

4. The standard of inadequate representation may be considered in relation to the community or territory as a whole. If inadequate

representation in the community or territory as a whole cannot be shown, the manufacturer may show the existence of "identifiable plot not yet cultivated" within the community or territory to demonstrate inadequate representation. *Bill Kelley Chevrolet, Inc. v Calvin*, 322 So.2d 50 (Fla. 1st DCA 1975); *Dave Zinn Toyota v Department of Highway Safety and Motor Vehicles*, 432 So.2d 1320 (Fla. 3d DCA 1983); and *Stewart Pontiac v State Department of Highway Safety and Motor Vehicles*, 511 So.2d 660 (Fla. 4th DCA 1987).

5. For the purpose of this case, the relevant territory or community is the Ford Ft. Lauderdale Multiple Point, which consists of Broward County. Further, the evidence establishes that the Ft. Lauderdale Multiple Point constitutes an identifiable and distinct retail marketing area.

6. Ford has sustained the burden of proof placed upon it by Section 320.642, *Florida Statutes.* It has demonstrated that the existing Ford dealers are now providing inadequate representation, in terms of both retail and total market penetration, in the community or territory as a whole.

7. Ford has further demonstrated that there exists an identifiable plot not yet cultivated, where the applicant dealer seeks to locate, in which representation is even more inadequate than in the overall territory or community as a whole.

8. The purpose of Section 320.642, *Florida Statutes,* is to prevent manufacturers from establishing more dealers than a market can support. *Plantation Datsun, Inc. v Calvin*, 275 So.2d —— (Fla. 1st DCA 1973). In this case, the market has simply outgrown Ford's existing five dealer network.

9. The Ft. Lauderdale Multiple Point, in general, is growing rapidly by any measure. Northwest Broward County (PMA 899), where the proposed dealer is to be located, is growing substantially. Ford's low market penetration, the significant resulting net registration losses, and rapidly growing markets demonstrate that an additional dealer is needed. The Ft. Lauderale Multiple Point does not have a Ford dealer that is conveniently located to the growing population located in and proximate to PMA 899. Additionally, and perhaps because of the lack of a dealer in the PMA 899, Ford retail penetration and registration efficiency in the Ft. Lauderdale Multiple Point has generally been significantly below both the district and national averages over the preceding seven years. Since no inherent reason has been proven relative to Ford's inability to achieve district or national penetration rates in the Ft. Lauderdale Multiple Point (or in PMA 899) and such

212

penetration rates is an achievable norm, it is concluded that Ford is receiving inadequate representation in the Ft. Lauderdale MP and in PMA 899 in particular. Ford has produced the most current statistics on retail market penetration which is a primary factor in determining adequacy of representation. See *Art Moran Palm Beach Pontiac-GMC, Inc. v Stewart Pontiac Company, Inc., etc.,* DOAH Case No. 86-0189 (Florida Div. Motor Vehicles 1987), decision affirmed on appeal in *Stewart Pontiac v State Department of Highway Safety and Motor Vehicles,* 511 So.2d 660 (Fla. 4th DCA 1987). Based on all of the evidence, Ford should be allowed to establish the proposed new dealership as applied for by Mullinax.

10. Based on the foregoing Findings of Fact and Conclusions of Law, Ford's Motion to Dismiss Bill Wallace Ford as a party Respondent has been rendered moot.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is RECOMMENDED that: The Department enter a Final Order approving the application of Mullinax, for a motor vehicle dealer license, based on the determination that Ford has demonstrated that it is receiving inadequate representation in the relevant territory or community and that the requirements of Section 320.641, *Florida Statutes,* with respect to the issuance of a license to Mullinax have been met.

DONE and RECOMMENDED this 1st day of July, 1988, in Tallahassee, Florida.